

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-20-00058-CV

———————————————

WELLS FARGO, N.A., Appellant

V.

LAWRENCE C. CLOWER, ELIZABETH ANN CLOWER, JOHN LAWRENCE CLOWER, J.C. (A MINOR CHILD), JO EMILY THORNTON, JAMES C. BROCCHINI, JULIA A. BERNAL, MARY C. RICHTER, AUDREY L. BERNAL, GINA C. DEJARNETTE, SAMANTHA J. RICHTER, JOHN C. CLOWER, TINA M. CLOWER, AS INDEPENDENT EXECUTOR OF THE ESTATE OF JOHN C. CLOWER, ELIZABETH LARUE ULLMAN, SUSAN MARIE DANIELS, JEFFREY CLARKSON CLOWER, BRENTON ULLMAN, JULIE CHRISTINE CLOWER, J.C. (A MINOR CHILD), J.C. (A MINOR CHILD), C.C. (A MINOR CHILD), Appellees

On Appeal from the 89th District Court
Wichita County, Texas
Trial Court No. 161,100-C

Before Sudderth, C.J.; Kerr and Birdwell, JJ.
Memorandum Opinion by Chief Justice Sudderth

## MEMORANDUM OPINION

## I. Introduction

This case involves the interpretation of a trust agreement entered into in 1969 by J.C. and Oneda Clower. The trial court interpreted the trust agreement in favor of Appellee Tina M. Clower, Independent Executor of the Estate of John C. Clower, and Appellees Lawrence C. Clower, Elizabeth Ann Clower, John L. Clower, and J.C., a minor child (collectively, the LC Trust Beneficiaries).[1] The trial court accordingly granted summary judgment for Appellees, concluding that the language of the trust agreement required Appellant Wells Fargo, N.A., as trustee, to distribute all of the trust's net income to the beneficiaries, and it awarded attorney's fees to Tina and the LC Trust Beneficiaries.

In the first of its five issues, Wells Fargo contends that the trust agreement gave it the sole discretion to make distributions as it saw fit and that the distributions were therefore not mandatory. We agree. Because Wells Fargo's first issue is dispositive, we reverse the trial court's judgment and remand the case for further proceedings without reaching Wells Fargo's remaining issues. *See* Tex. R. App. P. 47.1

---

[1] The remaining appellees—Jo Emily Thornton, James C. Brocchini, Julia A. Bernal, Mary C. Richter, Audrey L. Bernal, Gina C. DeJarnette, Samantha J. Richter, Elizabeth LaRue Ullman, Susan Marie Daniels, Jeffrey Clarkson Clower, Brenton Ullman, Julie Christine Clower, J.C. (a minor child), J.C. (a minor child), and C.C. (a minor child)—did not file an appellee's brief. Elizabeth LaRue Ullman, Susan Marie Daniels, and Jeffrey Clarkson Clower are the children of the deceased John C. Clower, and Julie Christine Clower, Brenton Ullman, J.C., J.C., and C.C. are his grandchildren.

(requiring the appellate court to hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to the appeal's final disposition).

## II.  Factual and Procedural Background

J.C. Clower married Audrey Lazette Clarkson.  Before Audrey died, they had two children, Edith and John.  J.C. later married Oneda Gats, and they had two more children, Lawrence and Kelly.

In 1969, J.C. and Oneda entered into a trust agreement and appointed First Wichita National Bank of Wichita Falls as trustee.  The trust agreement provided for the creation of four sub-trusts, one for each of J.C.'s children.  Only the John C. Clower Trust (JCC Trust) and the Lawrence Clower Trust (LC Trust) are at issue in this case,[2] which focuses primarily on two passages in the trust agreement.[3]

---

[2]The other two sub-trusts are the Edith Allene Brocchini Trust (EAB Trust) and the Kelly Jo Clower Trust (KC Trust).  Kelly died in July 1976, and Edith died in July 1999.

[3]The disputed passages are in Paragraphs V and IX of the trust agreement. Paragraph V includes, among other provisions, that the trustee has "sole and absolute discretion" with regard to paying net income in the amounts and proportions as it deems advisable, and Paragraph IX expresses, in pertinent part, the settlors' "desire" that the balance of net income from the JCC and EAB Trusts "be disbursed to all or any one of the beneficiaries of each of said trusts, as the Trustee may deem advisable," but also states that it is the settlors' "intention" that John, Edith, and their issue and descendants "share in the benefits of their respective trusts, as soon as possible."

3

The trust was made revocable until the death of either J.C. or Oneda, and it became irrevocable in 1970, when J.C. died. At the time, Lawrence was 20 years old, and John was 41 years old. The first distributions under the trust were made in 1974 or 1975. Oneda died in 1993. John's wife of 44 years—the mother of his three children—died the year after Oneda's death, and John married Tina at some point thereafter.

John and Lawrence received periodic trust statements that showed the name of the administering bank, the account number, and the amount of the investments. John acknowledged that from the day he was first involved with the trust, he had been told that the trustee "had absolute discretion." After a series of bank mergers and consolidations, Wells Fargo became trustee in 2000, and according to Wells Fargo, John eventually demanded all the trust income without regard for his issue and descendants.[4]

In 2004, Wells Fargo filed a declaratory judgment action against all of the trust beneficiaries, seeking construction of Paragraphs V and IX of the trust and the recovery of its attorney's fees incurred in the lawsuit. Wells Fargo maintained that these paragraphs gave it sole discretion to make distributions as it saw fit and did not require it to make mandatory distributions as John had claimed. John and the LC

---

[4]According to John, Wells Fargo had refused to distribute the full net income to him or to any other beneficiary and had instead chosen to accumulate net income in violation of the trust's terms.

Trust beneficiaries counterclaimed, challenging—among other things—Wells Fargo's standing and capacity as trustee, and seeking a declaratory judgment in their favor on the construction of the trust's terms.[5] After a three-day bench trial on the issue of standing, the trial court concluded in 2011 that Wells Fargo had standing as trustee.[6]

John died on November 30, 2012, leaving Tina, three children, and five grandchildren. In 2017, Tina, as John's executor and the primary beneficiary under his will, amended John's claims against Wells Fargo, seeking a declaration that he had been entitled to "all of the income earned" from the JCC Trust without "trustee discretion," and asserting a breach-of-fiduciary-duty claim for Wells Fargo's failure to make mandatory distributions of income in 1992–1993, 1996–2004, 2010, and 2012, in an aggregate amount of $288,741, plus interest, and attorney's fees under Civil Practice and Remedies Code Sections 37.009 and 38.001.[7] The LC Trust Beneficiaries incorporated Tina's allegations by reference, sought damages for conversion and constructive fraud, and sought attorney's fees.

---

[5]John and the LC trust beneficiaries also initially brought claims for conversion, negligence, and fraud.

[6]John also lost on the standing issue in federal court. *See Clower v. Wells Fargo Bank, N.A.*, 2:07-CV-510-TJW-CE, 2011 WL 13196511, at *2 (E.D. Tex. Sept. 30, 2011); *Clower v. Wells Fargo Bank, N.A.*, 259 F.R.D. 253, 254, 261–62 (E.D. Tex. 2009) (order granting class certification), *order vacated, appeal dism'd*, 381 Fed. Appx. 450 (5th Cir. 2010).

[7]In their live pleadings at the time of the final judgment, Tina and the LC Trust Beneficiaries abandoned their claims under the Uniform Prudent Investor Act.

Tina moved for summary judgment on the grounds that (1) the trust agreement required the trustee to distribute all of the net income of the JCC Trust to John or his descendants, (2) John's estate was entitled to recover undistributed trust income in the amount of $288,741, plus prejudgment interest for each year of undistributed income, and (3) John's estate was entitled to recover attorney's fees from the trust or from Wells Fargo under Civil Practice and Remedies Code Section 37.009 and Property Code Section 114.064. To her motion, Tina attached a copy of the trust agreement, Wells Fargo's discovery responses,[8] letters testamentary, and affidavits from counsel in support of the attorney's fees claim.

Wells Fargo responded that (1) there were no genuine issues of material fact as to whether it had sole discretion in making distributions, (2) distributing all of the net income to John's estate would deprive his issue and descendants of income distributions from the trust, and (3) there was no basis for awarding attorney's fees to John's estate from the trust or from Wells Fargo.

Wells Fargo also filed a motion for summary judgment, arguing that it was entitled as a matter of law to declaratory judgment on the claims by Tina and the LC Trust Beneficiaries. With regard to the LC Trust Beneficiaries' attorney's fees claim, Wells Fargo argued, among other things, that because the LC Trust Beneficiaries had

---

[8]In its discovery responses, Wells Fargo stated that as of November 30, 2012, there was $21,452.05 in undistributed income in the trust, and it attached the amount of income received by the trust and total distributions made to John from 1992 to 2012.

taken a position without any legal basis as to Wells Fargo's standing, there was no basis for them to recover attorney's fees. As to both Tina and the LC Trust Beneficiaries' arguments about trust construction, Wells Fargo relied on its interpretation of the trust to assert that Tina's breach-of-fiduciary-duty claim was baseless. And it relied on its argument that Tina and the LC Trust Beneficiaries' claims were meritless to support its argument that it was entitled to be reimbursed for its attorney's fees out of trust funds because they were incurred in discharging its obligations as trustee. Wells Fargo sought the return of funds that it had been ordered to deposit into the trial court's registry[9] and requested that the remaining balance of its attorney's fees be paid by the trust because "they were properly paid to defend [against] the ridiculous position taken by" Tina and the LC Trust Beneficiaries.

To its motion, Wells Fargo attached, among other things, a copy of the trust agreement and John's will; the live pleadings; the trial court's interlocutory judgment on standing; discovery responses from Tina and the LC Trust Beneficiaries; copies of statutes, case law, and treatises; and affidavits and other documents in support of its claim for attorney's fees.

---

[9]In November 2008, the trial court ordered Wells Fargo to stop using trust funds to pay its legal fees and expenses and to pay into the court's registry the amount it had already taken from the trust during the litigation to pay for its attorney's fees. Wells Fargo paid $261,099.32 into the trial court's registry, resulting in a balance of $270,607 by 2018.

Tina filed special exceptions, in which she complained that Wells Fargo had failed to state any specific summary judgment grounds, and she responded to Wells Fargo's motion based on how she "decipher[ed]" it, particularly with regard to Paragraphs V and IX of the trust agreement. The LC Trust Beneficiaries filed special exceptions and a response to Wells Fargo's motion[10] in which they adopted Tina's arguments.

The trial court granted Tina's motion on the first two grounds and denied it on the third (attorney's fees) ground, denied Wells Fargo's motion, and declared that the trust agreement required mandatory distributions of all net income from the trust.

The trial court subsequently held a trial on the parties' requests for attorney's fees to determine who was entitled to them and who was responsible for paying them, and to dispose of the funds in the trial court's registry. In the final judgment, the trial

---

[10]The LC Trust Beneficiaries were a little more direct in how they characterized Wells Fargo's case: "Summary of this Foolish Lawsuit." As to Wells Fargo's characterizations of the beneficiaries of the LC Trust and the KC Trust as necessary parties, which the LC Trust Beneficiaries complained drove up the costs of the litigation unnecessarily, they asserted, "Anyone with a high school education who reads Section IX will know that i[t] does not apply to the [LC Trust] or the [KC Trust]." The LC Trust Beneficiaries accused Wells Fargo of bringing a frivolous suit, argued that Wells Fargo should pay all of the legal fees and expenses of all of the parties it had sued in the case, and argued that Wells Fargo should repay the legal fees in the court's registry that it had "pilfered from the four trusts." The LC Trust Beneficiaries also referred the trial court to Wells Fargo's bad acts in its retail banking practices that had been covered by the media in 2016.

court ordered Wells Fargo to pay to Tina $288,741.37 in undistributed trust income,[11] as well as $224,756.84 in prejudgment interest; ordered that the $261,099.32 that had been deposited into the registry (along with any interest thereon) be distributed in equal amounts to the JCC Trust, the EAB Trust, the LC Trust, and the JC Trust; awarded to Tina $162,066.73 in attorney's fees through entry of the judgment, as well as appellate attorney's fees, to be recovered from Wells Fargo; and awarded to the LC Trust Beneficiaries $145,016.52, as well as appellate attorney's fees, to be recovered from Wells Fargo. The trial court also incorporated its earlier orders on standing and summary judgment into the final judgment.

Upon Wells Fargo's timely request, the trial court made findings of fact and conclusions of law, noting in a footnote that because summary judgments did not require findings, the terms of the summary judgment had been recited merely for procedural context. The trial court expressly found that an award of attorney's fees to

---

[11]In its motion for reconsideration, Wells Fargo asserted that the correct amount of undistributed income minus disbursements made from income and plus or minus transfers to or from income was actually $2,541.66 because Tina had "cherry pick[ed]" certain years and had failed to take later years' distributions into account. Tina replied that Wells Fargo had never previously challenged or disputed her specific calculations of net income and challenged Wells Fargo's assertion, which she characterized as claiming that "it overpaid in other years" when it failed to pay net income for eleven different years, notwithstanding the Property Code's defining net income on a year-by-year basis. *See* Tex. Prop. Code Ann. § 116.002(1), (8) (defining "net income" as "total receipts allocated to income during an accounting period,") and defining "accounting period" as "a calendar year unless another 12-month period is selected by a fiduciary". The trial court ordered that the motion and any evidence "proposed by the motion" would not be heard or considered.

Wells Fargo was "neither equitable, nor just." Wells Fargo appealed, and Tina and the LC Trust Beneficiaries each cross-appealed. Tina and the LC Trust Beneficiaries subsequently dismissed their cross-appeal during the case's pendency on the basis that they no longer desired to alter the trial court's judgment.

## III. Discussion

Wells Fargo argues that the trial court erred by granting summary judgment for Tina and by denying its motion for summary judgment and that the trial court abused its discretion by awarding prejudgment interest and attorney's fees to Tina and attorney's fees to the LC Trust Beneficiaries, by denying attorney's fees to Wells Fargo, and by ordering Wells Fargo to return to the trust the legal fees it had paid from trust funds.

In addition to addressing the merits of Wells Fargo's arguments, Tina argues that Wells Fargo "waived its right to complain about the trial court's ruling on the trust interpretation issue when it abandoned that claim in amended pleadings." Wells Fargo replies that nothing supports Tina's waiver contention. We begin our analysis by addressing Tina's waiver argument.

### A. Waiver

#### 1. The Parties' Arguments

Tina argues that Wells Fargo filed amended pleadings in which it omitted its cause of action for declaratory judgment for trust construction, abandoning that claim

10

and waiving any error in connection with the denial of its motion for summary judgment.

Wells Fargo replies that it neither amended nor replaced its pleadings after the trial court granted summary judgment and that it did not expressly abandon its earlier pleadings or file a "fourth amended original petition" after the trial court granted summary judgment. Wells Fargo contends that what it filed was a separate petition that supplemented its earlier pleadings by addressing the two issues remaining in the case—attorney's fees and the funds in the trial court's registry.

## 2. Applicable Rules of Civil Procedure

We look to the Rules of Civil Procedure that govern pleadings first, *see generally* Tex. R. Civ. P. 45–98, and are commanded that all pleadings "shall be construed so as to do substantial justice." Tex. R. Civ. P. 45.

An original pleading—original petition, counterclaim, cross-claim, or third party claim—shall contain a short statement of the cause of action sufficient to give fair notice of the claim involved, a statement that the damages sought are within the court's jurisdictional limits, a demand for judgment for all the relief to which the party deems himself entitled, and—except for suits governed by the Family Code—a statement of how much monetary relief the party seeks. Tex. R. Civ. P. 47. Statements in a pleading may be adopted by reference in a different part of the same pleading or in another pleading or in any motion so long as the pleading containing such statements has not been superseded by an amendment under Rule 65. Tex. R.

Civ. P. 58. Written instruments constituting, in whole or in part, the claim sued on may be made a part of the pleadings by copies thereof being attached or filed and referred to as such, and "[s]uch pleadings shall not be deemed defective because of the lack of any allegations which can be supplied from said exhibit." Tex. R. Civ. P. 59.

Subsequent pleadings are characterized as either amended pleadings or supplemental pleadings, and they serve different purposes:

> The object of an amendment, as contra-distinguished from a supplemental petition or answer, is to add something to, or withdraw something from, that which has been previously pleaded so as to perfect that which is or may be deficient, or to correct that which has been incorrectly stated by the party making the amendment, or to plead new matter, additional to that formerly pleaded by the amending party, which constitutes an additional claim or defense permissible to the suit.

Tex. R. Civ. P. 62. "An amended answer or an amended petition is not a supplement of the pleading it amends and is not to be taken into consideration along with it. The amendment completely supplants the pleading it amends." *Dyche v. Simmons*, 264 S.W.2d 208, 214 (Tex. App.—Fort Worth 1954, writ ref'd n.r.e.).

To provide notice of the amendment, the amending party "shall point out the instrument amended, as 'original petition,' or 'plaintiff's first supplemental petition,' or as 'original answer,' or 'defendant's first supplemental answer' or other instrument filed by the party," and the amending party "shall amend by filing a substitute therefor, entire and complete in itself, indorsed 'amended original petition,' or 'amended first supplemental petition,' or 'amended original answer,' or 'amended first

12

supplemental answer,' accordingly as said instruments of pleading are designated."
Tex. R. Civ. P. 64; *see In re S.C.S.*, 201 S.W.3d 882, 886 (Tex. App.—Eastland 2006, no pet.) (stating that Rule 64 requires the amending party to point out which instrument is being amended and requires abandonment of a pleading "by an express act rather than by implication"), *disapproved of on other grounds by Iliff v. Iliff*, 339 S.W.3d 74, 78–81 & n.2 (Tex. 2011). Under Rule 65, unless the substituted instrument is set aside on filing of exceptions, the prior pleading "shall no longer be regarded as part of the pleading in the record of the cause," unless some exception (not applicable here[12]) applies. Tex. R. Civ. P. 65. Causes of action not contained in an amended pleading are usually effectively dismissed when the amended pleading is filed. *FKM P'ship, Ltd. v. Bd. of Regents of Univ. of Hous. Sys.*, 255 S.W.3d 619, 633 (Tex. 2008).

A supplemental pleading, on the other hand, does not replace its preceding pleading. *See* Tex. R. Civ. P. 69. Its purpose "is to contain special exceptions, general denials, and the allegations of new matter not before alleged by him, in reply to those which have been alleged by the defendant." *Intercity Invs. Co. v. Plowman*, 542 S.W.2d 260, 263 (Tex. App.—Fort Worth 1976, no writ); *see* Tex. R. Civ. P. 69 (stating that a supplemental pleading responds to the other party's last preceding pleading and "shall

---

[12]The superseded pleading can still be regarded as part of the case if someone has complained about "some error of the court in deciding upon the necessity of the amendment, or otherwise in superseding it," and "exception be taken to the action of the court, or unless it be necessary to look to the superseded pleading upon a question of limitation." Tex. R. Civ. P. 65.

not repeat allegations formerly pleaded further than is necessary as an introduction to that which is stated in the pleading then being drawn up"). A supplemental pleading is not an appropriate method of stating a new cause of action or an additional affirmative defense. *Retzlaff v. Tex. Dep't of Criminal Justice*, 135 S.W.3d 731, 737 (Tex. App.—Houston [1st Dist.] 2003, no pet.) (op. on reh'g) (citing *Wegener v. Erdman*, 154 S.W.2d 969, 970 (Tex. App.—Fort Worth 1941, no writ)). The original petition and its supplements, and the original answer and its supplements, "constitute separate and distinct parts of the pleadings of each party." Tex. R. Civ. P. 69.

"When a party has mistakenly designated any plea or pleading, the court, if justice so requires, shall treat the plea or pleading as if it had been properly designated." Tex. R. Civ. P. 71; *see Retzlaff*, 135 S.W.3d at 737. That is, a supplemental pleading may inadvertently be denominated an amended pleading, and vice versa, and in the absence of a special exception directly challenging the misnomer, the pleading should be liberally construed according to its contents rather than its endorsement. *Mobile Am. Sales Corp. v. Rivers*, 556 S.W.2d 378, 382 (Tex. App.—San Antonio 1977, writ dism'd) (quoting 2 R. McDonald, Texas Civil Practice § 8.01.4 (1970), and holding that when no complaint was made to any such petitions until after judgment was rendered and "it appear[ed] obvious from the reading of the petitions involved that they were intended as additions to, rather than replacement of, prior pleadings" and were treated as such by all the parties, the misnomer was unimportant).

### 3. Case Law

Pleadings are ordinarily given liberal construction in order to ascertain the pleader's intent and should be so construed as to do substantial justice. *Intercity Invs. Co.*, 542 S.W.2d at 263. As noted above, we look to the substance of a plaintiff's pleading, not its form or title, to determine the nature of what the plaintiff sought. *See Brumley v. McDuff*, 616 S.W.3d 826, 833 (Tex. 2021) (stressing that courts should acknowledge the substance of the relief sought despite the formal styling of the pleading); *see also State Bar of Tex. v. Heard*, 603 S.W.2d 829, 833 (Tex. 1980) ("We look to the substance of a plea for relief to determine the nature of the pleading, not merely at the form of title given to it."). The Supreme Court of Texas has recognized that a pleader's clearly expressed intent can help determine whether a new pleading has superseded a prior pleading. *FKM P'ship, Ltd.*, 255 S.W.3d at 633 (citing *Ortiz v. Collins*, 203 S.W.3d 414, 421 n.4 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (op. on reh'g)); *Chicago, R.I. & T. Ry. Co. v. Halsell*, 83 S.W. 15, 15 (Tex. 1904).[13]

---

[13]In *Halsell*, the defendant filed a "supplemental answer" on June 30, 1903, in which it denied an allegation of partnership, and an "amended original answer" on July 2, 1903, in which it did not deny the partnership allegation. 83 S.W. at 15. The court initially noted that "[t]he pleading called a supplemental answer is, in its substance, a direct and full reply to the cause of action set up in the plaintiff's petition . . . and under the rules of pleading should be properly denominated as either an original or amended answer." *Id.* The court then considered the status of the subsequently filed "amended original answer." *Id.* The court stated,

> In determining what pleadings are thus superseded by amendment we must look to their contents—to what they are—and not merely to what they are called. The pleader cannot complain of this, because it is only

15

It is, of course, helpful when pleadings state within their text exactly what it is that they are trying to accomplish. *See, e.g.*, *Sixth RMA Partners, L.P. v. Sibley*, 111 S.W.3d 46, 49–50 (Tex. 2003); *Sparkman v. First State Bank of Handley*, 246 S.W. 724, 726 (Tex. App.—Fort Worth 1918, no writ) ("Plaintiff herein . . . files this its first supplemental petition in aid of the original petition hereinbefore filed."). *Cf. Holland v. First Nat'l Bank in Dall.*, 597 S.W.2d 406, 411 (Tex. App.—Dallas 1980, writ dism'd) (noting that the pleading under review, "though labeled 'supplemental,' attempts to raise several additional defenses to the bank's suit, and, therefore, is an amendment to the original answer subject to the provisions of Rule 63").

---

by treating the misnamed plea as what it ought to have been styled that it could ever have had any legal standing in the case. When it is thus treated as a pleading of the first class, the rule that an amended pleading supersedes all previous ones of the same class becomes applicable to it, and the amended original answer last filed displaced it as a pleading in the case. An amended pleading such as that last filed takes the place of all previous original and amended answers, and is required to contain within itself all of the defenses relied on to the plaintiff's petition or amended petition; supplemental answers, proper, being allowed by the rules only for a different purpose. Hence the plaintiff had the right to go into the trial on the assumption that no defense was relied on but those set up in the last amendment. Had this pleading shown on its face that the pleader, under an error, was still intending to rely both upon it and the former plea, called by him his supplemental answer, it may be that the plaintiff would have been required to except to this disregard of the rules, or be held to have waived it. But there is nothing sufficient to indicate to the plaintiff that the defendants intended their last pleading to have any other effect than that given to them by the rules.

*Id.*

16

In *Sibley*, for example, in the first of its two supplemental pleadings, the appellants stated, "This Supplemental Petition is to supplement and not to take the place of Plaintiff's Original Petition on file in this case. This Supplemental Petition is filed to include an 'a/k/a' designation for Plaintiff. RMA Partners, L.P. and Sixth RMA Partners, L.P. are one and the same." 111 S.W.3d at 49. Three years later, the appellants filed a second supplemental petition, stating, "This Second Supplemental Petition is to supplement and not to take the place of Plaintiff's Original Petition and Plaintiff's Supplemental Petition on file in this case. This Second Supplemental Petition is filed to correct a misnomer of the Plaintiff." *Id.* at 50. In the second supplemental petition, the appellants corrected the "a/k/a" designation to "Sixth RMA Partners, L.P., a/k/a RMA Partners, L.P." and further stated, "Paragraph 1 of Plaintiff's Original Petition, as supplemented by Plaintiff's Supplemental Petition filed July 3, 1996, is hereby supplemented to read as follows . . . Plaintiff, Sixth RMA Partners, L.P., a/k/a RMA Partners, L.P. ("RMA") is a Delaware Limited Partnership doing business in Texas." *Id.*

The appellee argued in the supreme court that the filing of the second supplemental petition instead of an amended original petition meant that Sixth RMA had failed to join the case, precluding the application of Rule of Civil Procedure 28 (which provides for an entity to sue or be sued under an assumed name). *Id.* at 53. The court first noted that Rule 28 did not mandate the procedural method under which a substitution of correct legal name may be accomplished and then concluded

17

that the correct legal name could be substituted by filing either a motion requesting substitution or a pleading substituting the correct legal name for the assumed name. *Id.*

With regard to the appellee's argument that the proper function of a supplemental petition is merely to respond to the opposing party's preceding pleading, the court revisited its "explanation of the proper function of original, supplemental, and amended pleadings," in *Glenn v. Dallas County Bois D'arc Island Levee District*, 268 S.W. 452 (Tex. 1925), in which it stated:

> Under the prescribed practice in the district and county courts the original and the supplemental pleadings "constitute separate and distinct parts of the pleading of each party," the former being for the purpose of stating or defending against the cause of action, and the latter for the purpose of replying to the allegations of the opposing party immediately preceding them; whereas an amendment *to either*, "as contradistinguished from a supplemental petition or answer," is designed to "add something to, or withdraw something from" the amending party's own pleading, so as to cure its deficiencies.

*Id.* (emphasis added) (quoting *Glenn*, 268 S.W. at 453).

The court acknowledged that in some circumstances, a supplemental pleading "may properly be used to substitute a party's correct legal name," but that under the circumstances of the case, because the second supplemental pleadings were not filed in reply to any factual or legal allegation contained in the appellee's preceding pleadings, the appellants' use of the second supplemental pleadings to substitute the correct legal name was improper. *Id.* at 54 ("The factual allegations regarding Sixth

18

RMA's true name would properly have been set forth in amended original pleadings.").

Notwithstanding the procedural error, however, the court stated that the factual allegations in the second supplemental pleadings were not void and of no effect because no motion to strike them had been filed. *Id.* (referencing *Lemp v. Armengol*, 26 S.W. 941 (Tex. 1894)).[14] Accordingly, because pleading defects are waived if not properly objected to, *see* Tex. R. Civ. P. 90, the court held in *Sibley* that because the appellee had not requested that the second supplemental pleadings be stricken or that the appellants be required to replead in strict compliance with the Texas Rules of Civil Procedure, those pleadings had to be given effect. 111 S.W.3d at 55. "Although Sixth RMA filed the wrong pleadings to substitute its correct legal name, the second supplemental pleadings were not excepted to or struck by the trial court, and therefore they must be given effect." *Id.*

The court again quoted *Glenn*, stating, "[T]hough a pleading may be denominated a supplement it may actually constitute an amendment or set up a counter[-]claim or cross-action, and, if not excepted to but allowed to stay in the case until judgment, may be considered *for all that it means instead of what it is called.*" *Id.*

_____

[14]In *Lemp*, the court noted that even though allegations would properly have appeared in an amended original petition, "having been pleaded, they cannot be disregarded," and if a motion had been filed to strike the supplemental petition, it should have been granted. 26 S.W. at 943. But no motion to strike had been filed. *Id.*

(emphasis added) (quoting *Glenn*, 268 S.W. at 453). The court then read the original and supplemental pleadings together to hold that they were sufficient to substitute the true party name and to support the trial court's judgment in favor of Sixth RMA. *Id.* (referencing Tex. R. Civ. P. 78, 83).

The court also noted, in referencing *Glenn* and *Lemp*, that the current Rules of Civil Procedure regarding original and supplemental pleadings, "and amendments to either," were substantively the same as those adopted by the court in 1877, and it noted that the pleading defect in *Sibley* could have been cured by amendment. *Id.* at 53–54.

Tina refers us to *Dolenz v. All Saints Episcopal Hospital*, 638 S.W.2d 141, 142 (Tex. App.—Fort Worth 1982, writ ref'd n.r.e.), to support her argument that Wells Fargo abandoned its trust construction claim in its 2019 filings. In *Dolenz*, the appellant, a doctor, sued the hospital seeking injunctive relief and $100,000 in damages for slander. *Id.* After the trial court denied injunctive relief in a partial summary judgment, the appellant amended his petition twice in the three years before the jury trial began on his slander claim. *Id.* In his live pleading at the time of the trial, the appellant neither alleged circumstances by which he might have founded a claim for injunctive relief nor prayed for such relief. *Id.* On the hospital's motion for instructed verdict, the trial court entered a take-nothing judgment. *Id.*

In holding on appeal that the appellant had abandoned his injunctive relief claim when the jury trial began, we relied on the law applicable to amended pleadings,

noting, "In a situation such as presented [here,] an amended pleading supplants the instrument amended and that which it amends is no longer proper to be considered part of the trial record." *Id.*; *see Jones v. Frank Kent Motor Co.*, No. 02-14-00216-CV, 2015 WL 4965798, at *5 (Tex. App.—Fort Worth Aug. 20, 2015, no pet.) (mem. op.) (noting that even when the trial court has denied a claim through partial summary judgment, "filing an amended petition that does not include a cause of action effectively dismisses the omitted claim as of the time the amended pleading is filed"); *see also Pipes v. Hemingway*, No. 05-13-00428-CV, 2014 WL 1477735, at *1 (Tex. App.— Dallas Apr. 14, 2014, pet. denied) (mem. op.);[15] *Radelow-Gittens Real Prop. Mgmt. v. Pamex Foods*, 735 S.W.2d 558, 559 (Tex. App.—Dallas 1987, writ ref'd n.r.e.);[16]

---

[15]In *Pipes*, after the trial court granted summary judgment for all but one of the defendants, the plaintiff filed an amended petition that omitted all of the defendants who had received summary judgment. 2014 WL 1477735, at *1. The trial court subsequently granted the motion to dismiss filed by SMS, the remaining defendant. *Id.* The plaintiff filed a notice of appeal, naming all of the defendants but then sent a letter to the court stating that he was not appealing the dismissal of claims against SMS. *Id.* The Dallas court held that the plaintiff had abandoned all of his claims against the non-SMS defendants when he filed the amended petition that omitted all of them. *Id.* The court noted, "Had [the plaintiff] filed a supplemental pleading, instead of an amended pleading, his claims against these defendants would have been preserved," but as it stood, he had waived the error, if any, as to the summary judgments. *Id.*

[16]In *Radelow-Gittens*, the landlord sued Pamex (tenant) and a third-party defendant. 735 S.W.2d at 559. Pamex prevailed on a motion for partial summary judgment, and neither of the landlord's subsequently filed amended petitions contained any claims against Pamex. *Id.* The court held that when the landlord proceeded to trial on its third amended petition, at that point, it had abandoned all of its prior claims against Pamex brought in its first amended petition and waived error,

21

*Associated Contract Eng'rs & Scientists, Inc v. Dall. ISD*, No. 05-01-02053-CV, 2002 WL 31730962, at *3 (Tex. App.—Dallas Dec. 5, 2002, no pet.) (mem. op., not designated for publication).[17]

We must accordingly consider what the parties filed in this case to determine whether Wells Fargo intended to file an amended pleading after summary judgment that eliminated its trust-construction claim.

### 4. Pre-Summary Judgment Filings

Wells Fargo filed its "Original Petition for Declaratory Judgment" on September 27, 2004, in which it asked the trial court to construe the trust, particularly Paragraphs V and IX, and declare that it had sole and absolute discretion in distributing income; it sought attorney's fees under Civil Practice and Remedies Code Section 37.009. Wells Fargo attached a copy of the trust agreement to this filing. *See* Tex. R. Civ. P. 59.

On August 19, 2005, Wells Fargo filed its "First Amended Original Petition for Declaratory Judgment," which copied its 2004 request for trust construction,

---

if any, by the trial court in rendering summary judgment for Pamex. *Id.* at 559–60 (referencing *Dolenz*, 638 S.W.2d at 142).

[17]In *Associated Contract Engineers*, the plaintiff amended its petition, omitting all of the causes of action upon which the trial court had granted summary judgment. 2002 WL 31730962, at *2. The trial court subsequently dismissed one of the remaining two causes of action after giving the plaintiff the opportunity to replead one of the claims and then granted summary judgment on the remaining claim. *Id.* The Dallas court held that the plaintiff had voluntarily dismissed the other claims through amending the petition. *Id.* at *3.

particularly Paragraphs V and IX, and declaratory relief but added an affidavit "to clarify the proper name of the legal titleholder of properties held previous by various legal entities in various fiduciary capacities."

Three years later, on August 8, 2008, Wells Fargo filed its "Second Amended Original Petition for Declaratory Judgment," in which it copied its earlier requested relief (trust construction, particularly Paragraphs V and IX) and its request for attorney's fees under the Civil Practice and Remedies Code and added the series of transactions by which Wells Fargo had become trustee. The same copy of the trust agreement was attached but the affidavit that had been attached to the 2005 filing was not included.

On January 22, 2009, Wells Fargo filed its "Third Amended Original Petition for Declaratory Judgment," which copied its previous pleadings and added a request for attorney's fees under Property Code Section 114.064 in addition to under the Civil Practice and Remedies Code. The same copy of the trust agreement attached to the preceding filings was also attached to this one.

On June 6, 2011, the trial court held in an interlocutory order that Wells Fargo had standing to maintain the suit. More than six years later, on October 20, 2017, Tina filed her fourth amended answer and third amended cross-action and counterclaim, in which she sought attorney's fees under Civil Practice and Remedies Code Sections 37.009 and 38.001, in addition to trust construction (Paragraphs V and IX) in her favor and income distributions resulting from breach of fiduciary duty.

23

The LC Trust Beneficiaries' fourth amended answer and third amended counterclaim, filed November 1, 2017, mirrored Tina's October 20, 2017 pleadings by incorporating Tina's allegations and seeking reimbursement of the attorney's fees Wells Fargo had paid using trust funds and their own attorney's fees incurred because of the lawsuit. In Tina's April 17, 2018 reply to Well's Fargo's response to her motion for summary judgment, she requested a full evidentiary hearing on attorney's fees. Likewise, in the LC Trust Beneficiaries' May 10, 2018 special exceptions and response to Wells Fargo's motion for summary judgment, they asked for the trial court to, among other things, "set a full evidentiary hearing to consider the amount of attorney[']s fees to which [the LC Trust Beneficiaries] are entitled."

On June 27, 2019, the trial court signed an order granting summary judgment to Tina and denying summary judgment to Wells Fargo on the construction of the trust instrument. The trial court did not dispose of the attorney's fees claim, and it noted in the order that the order was not a final or appealable judgment.

### 5. Post-Summary Judgment Filings

Three months after the trial court signed the summary judgment order, on September 25, 2019, Wells Fargo filed a "Petition for Declaratory Judgment Regarding Plaintiff's Attorney's Fees and Costs." This document did not comply with Rule 64's requirement that the party amending a previous pleading point out which instrument is being amended. *See* Tex. R. Civ. P. 64. In this pleading, Wells Fargo made specific reference to Paragraph XIV(14) and attached the trust instrument in

24

arguing that it was entitled to reimbursement of the fees and costs expended in defending against the counterclaims filed by the LC Trust Beneficiaries and Tina and for "defending its interpretation of the trust provision dealing with distribution language." *See* Tex. R. Civ. P. 69 (stating that a supplemental petition or answer "shall be a response to the last preceding pleading by the other party"). Wells Fargo sought $433,011.41 in attorney's fees and costs and the $270,607 deposited into the court's registry, asked for attorney's fees under Civil Practice and Remedies Code Section 37.009, and prayed for relief "on final trial hereof."

Not quite a month later, on October 15, 2019, the LC Trust Beneficiaries responded by filing their "Supplemental Pleading Responding to Wells Fargo's 'Petition for Declaratory Judgment Regarding Plaintiff's Attorney's Fees and Costs.'" In the document, the LC Trust Beneficiaries stated that they "specifically title[d] this pleading as a supplemental pleading and do not hereby abandon any other claims currently pending," identified Wells Fargo's "Petition for Declaratory Judgment Regarding Plaintiff's Attorney's Fees and Costs filed on September 19, 2019" as "the 'Petition,'" and asserted, "The Petition is an amended petition which supersedes prior pleadings and abandons all other claims not therein made."

On November 1, 2019, Wells Fargo filed its "First Amended Petition for Declaratory Judgment Regarding Plaintiff's Attorney's Fees and Costs." In this document, Wells Fargo added Property Code Section 114.064 to its claim for costs and attorney's fees. Shortly thereafter, on November 7, 2019, in its trial brief on the

25

attorney's fees issue, Wells Fargo referenced the full background of the case, attached a copy of the trust instrument, and prayed for judgment that as trustee it "ha[d] the right to allocate income among all of the beneficiaries of the four Clower trusts or to withhold the distribution of part or all of a trust's income as it in its sole discretion deems prudent," for Tina and the LC Beneficiaries' counterclaims to be denied, and for the award of its costs and attorney's fees.

### 6. Attorney's Fees Hearing

At the November 13, 2019 hearing on attorney's fees, no one argued that Wells Fargo had abandoned its declaratory judgment claim for trust interpretation. To the contrary, during cross-examination of Wells Fargo's counsel, Tina's attorney asked whether the declaratory relief sought by Wells Fargo in the case only pertained to the EAB and JCC trusts, and Wells Fargo's attorney replied that the relief sought "applied to the four trusts, all of which . . . would be affected by the judgment of the Court as to whether or not [Wells Fargo] had discretion to make distributions." Tina's attorney then asked if there was already a summary judgment in place that Wells Fargo had breached the terms of the JCC Trust, and Wells Fargo's counsel replied, "I believe the Court did find that . . . [a]nd we disagree with that finding . . . and take exception to that ruling." Tina's counsel replied, "[J]ust like I take exception with the standing [ruling], we understand it's not a final order."

During the cross-examination of Tina's counsel, the LCC Trust Beneficiaries' counsel asked him to look at the "First Amended Pleading filed by Wells Fargo in this

26

case," referencing one filed on "August 8, 2008."[18]  Nothing was asked about Wells

Fargo's "Petition for Declaratory Judgment Regarding Plaintiff's Attorney's Fees and

Costs," filed eleven years later, on September 25, 2019, or "First Amended Petition

for Declaratory Judgment Regarding Plaintiff's Attorney's Fees and Costs," filed on

November 1, 2019.

### 7. Analysis

Here, over ten years passed between Wells Fargo's filing of its 2009 "Third

Amended Original Petition for Declaratory Judgment," in which it sought trust

construction and attorney's fees under the Property and Civil Practice and Remedies

Codes and attached a copy of the trust agreement, and the trial court's 2019 granting

of partial summary judgment on the trust construction issue.  Because the trial court

denied Tina's summary judgment request for attorney's fees, that was one of the

remaining issues in the case.

On September 25, 2019, Wells Fargo filed its "Petition for Declaratory

Judgment Regarding Plaintiff's Attorney's Fees and Costs," asserting that it had spent

$703,618.41 (of which $270,607 was already in the court's registry) in defending the

trust against the counterclaims brought in the case and arguing that it was entitled to

reimbursement under Paragraph XIV(14).  Unquestionably, this petition was a

"misnamed plea," *see Halsell*, 83 S.W. at 15, because it did not specify whether it was

---

[18]The record reflects that Wells Fargo's "Second Amended Original Petition for
Declaratory Judgment" was the pleading filed on August 8, 2008.

an amended or supplemental pleading.[19]  But based on the circumstances set out above, and because a claim for attorney's fees necessarily implies the existence of a separate cause of action requiring disposition by the court,[20] *Infonova Sols., Inc. v. Griggs*, 82 S.W.3d 613, 616 (Tex. App.—San Antonio 2002, no pet.) (citing *Mayfield*, 923 S.W.2d at 593), we infer that the document was intended to be, and acted as, a supplemental—rather than amended—pleading because it pertained solely to attorney's fees rather than the claim upon which such fees were based, and because it

---

[19]Additionally, Wells Fargo did not indicate in this document that it was amending its earlier pleadings or abandoning its trust construction claim.  *Cf.* Tex. R. Civ. P. 64 (requiring an express rather than implicit abandonment).

[20]This is because, in Texas, attorney's fees may not be recovered from an opposing party unless such recovery is provided for by statute or by contract between the parties. *Travelers Indem. Co. v. Mayfield*, 923 S.W.2d 590, 593 (Tex. 1996); *see MBM Fin. Corp. v. Woodlands Operating Co.,* 292 S.W.3d 660, 670 (Tex. 2009) (explaining that Declaratory Judgments Act cannot be used just to obtain attorney's fees a party might not otherwise be entitled to recover); *see also Allstate Ins. Co. v. Irwin*, No. 19-0885, 2021 WL 2021446, at *3 (Tex. May 21, 2021) ("[W]hen a party has a claim for which fees are unavailable, in addition to a claim for declaratory relief, the declaratory relief claim must do []more than merely duplicate the issues[] being litigated by the claims for which fees are unavailable.").  Part of the remedy offered by the Declaratory Judgments Act is a discretionary award of reasonable attorney's fees when equitable and just when a justiciable controversy exists between the parties and a declaration of the parties' rights will terminate the controversy or otherwise serve a useful purpose. *Irvin*, 2021 WL 2021446, at *6; *see also In re Xerox Corp.*, 555 S.W.3d 518, 529 (Tex. 2018) (orig. proceeding) ("[A]ttorney's fees are generally not damages, even if compensatory."); *Spicer v. Maxus Healthcare Partners, LLC*, 616 S.W.3d 59, 129 (Tex. App.—Fort Worth 2020, no pet.) (op. on reh'g) (noting "longstanding distinction between attorney's fees and damages made by the supreme court").  *But cf. In re Nalle Plastics Family Ltd. P'ship*, 406 S.W.3d 168, 175 (Tex. 2013) (orig. proceeding) (noting exception when an underlying suit concerns a claim for attorney's fees as an element of damages).

28

appears to respond to the last preceding pleadings by Tina and the LC Trust Beneficiaries regarding attorney's fees. *See id.*; *see also* Tex. R. Civ. P. 69; *Brumley*, 616 S.W.3d at 833. We likewise conclude that two months later, when Wells Fargo filed its "First Amended Petition for Declaratory Judgment Regarding Plaintiff's Attorney's Fees and Costs," it intended for this document to amend only the supplemental petition for attorney's fees that it had filed in September because it merely added another statutory provision to support its argument for attorney's fees. Wells Fargo mentioned nothing about abandoning its trust construction claim in this document, and not quite a week after filing it, Wells Fargo continued to reference the entire case in its trial brief in support of attorney's fees, in which it pleaded for, among other things, a judgment that as trustee, it had sole discretion over the trust.[21] None of the parties addressed the pleadings' names at the subsequent hearing except to misidentify them; rather, everyone at the hearing continued to act as if the previously decided issues—standing and trust construction—were still alive for purposes of appeal.

Accordingly, construing Wells Fargo's pleadings "so as to do substantial justice," *see* Tex. R. Civ. P. 45, 71, we hold that Wells Fargo's trust construction issue

---

[21]Wells Fargo listed 11 items in the prayer of its trial brief in support of attorney's fees, and the first item that it prayed for was for "[j]udgment that Wells Fargo as trustee of the Clower Trust has the right to allocate income among all of the beneficiaries of the four Clower trusts or to withhold the distribution of part or all of a trust's income as it in its sole discretion deems prudent."

29

was not abandoned.[22]  *Cf. Randolph v. Walker*, 29 S.W.3d 271, 275 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) (explaining that "[t]he key to the appellate waiver is the de jure abandonment of the claim by excluding it from amended pleadings following the adverse ruling").

## B. Trust Construction

### 1. Standard of Review

In a summary judgment case, the issue on appeal is whether the movant met the summary judgment burden by establishing that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law.  Tex. R. Civ. P. 166a(c); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009).  We review a summary judgment de novo, *Travelers Ins. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010), and consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding evidence contrary to the nonmovant unless reasonable jurors could not.  *Mann Frankfort*, 289 S.W.3d at 848.  We indulge every reasonable inference

---

[22]The better practice might have been to sever the trust construction issue into a final, appealable judgment, *see Direkly v. ARA Devcon, Inc.*, 866 S.W.2d 652, 655–56 (Tex. App.—Houston [1st Dist.] 1993, writ dism'd w.o.j.), or to use more care with the naming and filing of pleadings to avoid confusion.  *See Radelow-Gittens*, 735 S.W.2d at 560 (recognizing that the appellant could have pursued its right to appeal if it had not abandoned its claims against the appellee and observing, "For example, if [the appellant] had filed a *supplemental* pleading, instead of an *amended* pleading[] containing its new claims against [another party], the claims against [the appellee] would have been preserved" (emphasis added)).

and resolve any doubts in the nonmovant's favor. *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008).

## 2. Trust Interpretation

In its first issue, Wells Fargo argues that the trial court erred in how it construed the trust instrument.

The construction of a trust instrument is a question of law for the trial court, which must construe it to ascertain the settlors' intent from the language used within the instrument's four corners. *Eckels v. Davis*, 111 S.W.3d 687, 694 (Tex. App.—Fort Worth 2003, pet. denied). All terms must be harmonized to properly give effect to all parts, and if possible, the court should construe the instrument to give effect to all provisions so that no provision is rendered meaningless. *Id.*; *see Bergin v. Bergin*, 315 S.W.2d 943, 946–47 (Tex. 1958) ("[A]ny particular paragraph which, if considered alone, might indicate a contrary intention, must yield to the intention manifested by the whole instrument.").

If a trust's meaning is ambiguous, its interpretation becomes a fact issue for which summary judgment is inappropriate, and whether the meaning is ambiguous is a question of law for the court. *See Knopf v. Gray*, 545 S.W.3d 542, 545 (Tex. 2018) (interpreting will); *Eckels*, 111 S.W.3d at 694 (stating that if the trust's language is unambiguous and expresses the intent of the settlor, it is unnecessary to construe the instrument because it speaks for itself but if the meaning is uncertain or reasonably susceptible to more than one meaning, it is ambiguous); *see also G & H Towing Co. v.*

31

*Magee*, 347 S.W.3d 293, 296–97 (Tex. 2011) ("The purpose of a summary judgment is to 'provide a method of summarily terminating a case when it clearly appears that only a question of law is involved and that there is no genuine issue of [material] fact.'" (quoting *Gaines v. Hamman*, 358 S.W.2d 557, 563 (Tex. 1962))).

We look to the law that was in effect at the time that the trust became effective—here May 23, 1969—but look to the words of the instrument first and then, if necessary, turn to statutory provisions to fill in any gaps. *See The Episcopal Church v. Salazar*, 547 S.W.3d 353, 419 (Tex. App.—Fort Worth 2018) (noting that the Texas Trust Act was repealed in 1984), *aff'd in part, rev'd in part sub nom. Episcopal Diocese of Fort Worth v. Episcopal Church*, 602 S.W.3d 417 (Tex. 2020), *cert. denied*, 141 S. Ct. 1373 (2021); *see also* Tex. Prop. Code Ann. § 111.002 ("This subtitle and the Texas Trust Act, as amended . . . shall be considered one continuous statute, and for the purposes of any statute or any instrument creating a trust that refers to the Texas Trust Act, this subtitle shall be considered an amendment to the Texas Trust Act.").

### a. Relevant Terms of the Trust

Paragraph I of the trust instrument instructs the trustee to divide the trust properties in to 4 equal shares and to establish a separate sub-trust for each, for the use and benefit of the persons set forth: (1) John C. Clower Trust, "which shall be for the use and benefit of the Grantors, or the survivor thereof, John C. Clower and his issue and descendants. . . . (3) Lawrence Clower Trust, which shall be for the use and benefit of the Grantors, or the survivor thereof, Lawrence Clower and his issue

32

and descendants." Paragraph II provides that the trust was revocable as long as both grantors were alive.

Paragraph III instructs the trustee how to disburse net income to the grantors, stating,

> Until the death of the first to die of the Grantors, J.C. Clower or Oneda Clower, the Trustee shall hold, manage and control the property comprising the trust estates, collect the income therefrom, and shall disburse all of the net income therefrom to the Grantors, or expend the same for their benefit, in quarterly or other convenient installments as the Grantors may direct the Trustee.

Paragraph IV states that upon the death of the first to die of the grantors, the trust would become irrevocable and that the trustee thereafter "shall hold, manage, control and disburse the trusts as hereinafter provided."

Paragraph V provides that after the trust became irrevocable,

> [T]hen the Trustee is authorized and empowered to pay the net income of each of said trusts, to or among the beneficiaries of that particular trust, as above named, or to any one of them, in such amounts and proportions as our Trustee *in its sole and absolute discretion shall deem advisable*, from time to time, without regard to equality of distribution, PROVIDED HOWEVER, that any and all distributions made to the survivor of the Grantors herein, shall be taken in equal shares from the four trusts. Any income not so disbursed shall be incorporated into the corpus of the various trusts as an intregal [sic] part thereof to be held, administered and distributed in accordance with all the terms, conditions and limitations applying thereto. *In exercising its discretion as to the amount (if any) of such net income which is to be paid* to any of the aforesaid beneficiaries, our Trustee shall not be required to take into consideration any other

33

income or property which is available to any such beneficiary from any other source.[23]  [Emphasis added.]

Paragraph VII provides for how the trustee could disburse funds from the trust corpus rather than income, stating,

We authorize and empower the Trustee *in its sole and absolute discretion*, at any time and from time to time, to disburse from the corpus of any of the trust estates created under this agreement (even to the point of completely exhausting the same), such amounts as it may deem advisable to provide adequately and properly for any emergency or extraordinary expense of the current income beneficiary thereof, his or her spouse and children, including, but not by way of limitation, expenses incurred by reason of illness, disability and education.[24]  In determining the amounts of corpus to be so disbursed, the Trustee shall take into consideration any other income which such income beneficiary may have from any other sources, but not his capital resources; *and the Trustee's discretion shall be conclusive* as to the advisability of any such disbursement and the same shall not be subject to review. [Emphasis added.]

Paragraph IX states that after the death of the first to die of the two grantors,

*[I]t is our desire* that all of the balance of net income from the said [JCC Trust] and the [EAB Trust], after distributions are made to the surviving Grantor, be disbursed to all or any one of the beneficiaries of each of said trusts, *as the Trustee may deem advisable.*  It being our intention that our children, [John and Edith], and their issue and descendents [sic], shall share in the benefits of their respective trusts, *as soon as possible.* Notwithstanding anything herein to the contrary, we authorize our Trustee to pay all funeral expenses, purchase cemetary [sic] lots, provide suitable monuments or stones and pay any and all estate, inheritance,

---

[23]During a February 2008 hearing, John's counsel pointed out to the trial court that John was 76 years old, that he had only received a quarter of the income from the trust, and that "Wells Fargo knows this is what he's living on."

[24]During the 2019 hearing on attorney's fees, John's counsel argued that John had had to go to Mexico for dental work "because he didn't have the money to do it in the United States."

34

succession and other taxes (together with any interest or penalty thereon) assessed by the government of the United States or any state or territory thereof, of the Grantors, or either of them, and of any beneficiary of any trust created hereby, from their respective trust, provided that any such payments or distributions on behalf of either of the Grantors, shall be borne equally by all four trusts. [Emphasis added.]

Paragraph XI provides that upon the termination of the sub-trusts, the trustee "shall thereupon transfer and distribute, free of the terms of the trusts, all of the remaining trust corpus and income to the issue and/or descendents [sic] of the primary beneficiary (being one of our children) for whom said trust was named, per stirpes." Paragraph XII states that if there were no issue or descendants of the primary beneficiary of a sub-trust, then "the remaining corpus and income of such trust shall be equally divided between the other trusts established hereunder for our children, and distributed as provided therein."

Paragraph XIV sets out 16 specific powers and authority for the trustee "in addition to and not in substitution of powers conformed by law."[25] These specific powers included retaining or selling, exchanging, assigning, transferring, or reinvesting the trust property and "[t]o compromise, settle, or adjust any claim or demand by or against said trusts." One specifically denoted power states that the trustee could

_____

[25]The Texas Trust Act that was in effect in 1969 provided for 12 nonexclusive powers that the trustee of an express trust was authorized to use in the absence of contrary or limiting provisions in the trust instrument (none of which were contradicted by the terms of the trust instrument here). Tex. Rev. Civ. Stat. Ann. art. 7425b-25(A)–(L), at https://www.sll.texas.gov/library-resources/collections/historical-texas-statutes/bookreader/1948-1/#page/2166/mode/2up/search/7425b (last visited Sept. 7, 2021).

employ, among others, attorneys, "as it may deem advisable; to pay reasonable compensation for their services and to charge same to (or apportion same between) income and corpus as it may deem proper," and that it could "deal in any manner as between the trusts established herein as the Trustee may think advisable."

Paragraph XXIII designated the law of Texas as the trust's governing law and gave the trustee discretion in construing the terms of the trust:

> If and whenever in good faith in doubt as to the proper construction, interpretation or operation of this instrument or as to any matter invloving [sic] administration of any trust created by this trust agreement, or the rights of any beneficiary thereof, or the application, interpretation or construction of the Texas Trust Act or any amendment thereto, *the Trustee is hereby authorized to resolve all such doubts in such manner as the Trustee shall deem equitable and proper.* It is the Grantors' intention hereby to avoid suits for construction, interpretation or instructions to the fullest extent possible, and in the absence of bad faith,[26] all decisions and actions of the Trustee shall be final and binding upon the trust beneficiaries and all other intended parties. [Emphasis added.]

### b. The Parties' Arguments

Wells Fargo complains that the trial court erred by construing the trust instrument to require mandatory distributions, without trustee discretion, of all income from the JCC Trust to John or his descendants because the instrument's plain language grants the trustee broad discretion in distributing trust income, nowhere

---

[26]Wells Fargo had to pay $19,242.50 in attorney's fees to John and to the LC Trust Beneficiaries for discovery abuse during the case. The trial court also ordered a discretionary distribution of funds to Lawrence for payment of attorney's fees from his trust after Wells Fargo tried to require full invoices from Lawrence's lawyer that might divulge sensitive information during the litigation.

requires mandatory distributions of all net income from the JCC Trust, and merely states the grantors' precatory "desire" for disbursements to John or his descendants "as the Trustee may deem advisable."[27]

Tina responds that the trial court correctly construed the trust agreement because Paragraph IX treats the sub-trusts created for J.C.'s older children—John and Edith—differently from the rest of the agreement.

Wells Fargo relies on Paragraphs III, V, and XI of the Trust Agreement, while Tina relies on Paragraph IX. Wells Fargo argues that Paragraph IX contains no mandatory language, that its use of "desire" is merely precatory, and that the language about the trustee's "sole and absolute discretion" is clear.

### c. Analysis

Whether language is precatory—i.e., language that requests, recommends, or expresses a desire rather than a command—or testamentary is a question of intent. *Knopf*, 545 S.W.3d at 547 & n.7. Words that are precatory in their ordinary meaning will be construed as mandatory when it is evident that such was the grantor's intent. *Wattenburger v. Morris*, 436 S.W.2d 234, 239 (Tex. App.—Fort Worth 1968, writ ref'd n.r.e.). In *Wattenburger*, we considered a will and codicil and noted that when words like "desire" are used "in direct reference to the disposition of the testator's own

---

[27]Wells Fargo argues alternatively that the trust agreement is ambiguous and cannot be construed as a matter of law. Because we conclude that the trust instrument is unambiguous, we do not reach this argument. *See* Tex. R. App. P. 47.1.

property and show a clear intent to make such disposition without the intervention of any act by the . . . donee, they are ordinarily regarded as imperative and testamentary rather than precatory." *Id.* But precatory language is treated differently depending on whether it is directed to a beneficiary or an executor. *Id.* at 239–40. A wish directed to a beneficiary is generally regarded as precatory without a clear expression of intent to the contrary, while such words addressed to an executor "are more often regarded as mandatory." *Id.* at 240.

The testator in *Wattenburger* provided in his will for his three sons' inheritance to be held in trust, but after one of his sons predeceased him, he executed a codicil in which he noted that conditions had changed and that it was "[his] desire, in lieu of all bequests, devise or other benefits whatsoever which [his] grandchildren"—the deceased son's three children—"would or could have under [his] said will and testament, to bequeath to [them] . . . two thousand dollars each." *Id.* at 236–37. We held, under the circumstances of that case, that despite the use of the word "desire," "no one could reasonably believe that the testator had any intention other than to make the codicil an effective part of his will," making the questioned provision mandatory. *Id.* at 240; *see also Bergin v. Bergin*, 315 S.W.2d 943, 947 (Tex. 1958) (noting, when construing will drafted by layperson testator, that while words like "wanted," "wish," and "desire" in their ordinary and primary meaning are precatory, they can be construed as mandatory when used in a will "or when it appears from the context or

38

from the entire document that they are the expression of the testator's intention in making disposition of his property").

In contrast, when the plain language of a trust document states that the trustee shall have "sole discretion," those words are not capable of more than one meaning. *See El Paso Nat'l Bank v. Shriners Hosp. for Crippled Children*, 615 S.W.2d 184, 185 (Tex. 1981) ("The words that the trustee should have 'sole discretion' are clear."); *see also Knopf*, 545 S.W.3d at 545 ("A court must construe a will as a matter of law if it has a clear meaning."). Under a discretionary trust, a beneficiary is entitled only to the income or principal that the trustee, in his or her discretion, shall distribute to the beneficiary, and the beneficiary of such a trust cannot compel the trustee to pay him or to apply for his use any part of the trust property. *Malone v. Malone*, No. 02-08-00157-CV, 2009 WL 2579629, at *3 (Tex. App.—Fort Worth Aug. 20, 2009, pet. denied) (per curiam) (mem. op.) (noting that a court cannot substitute its discretion for that of the trustee). In *Malone*, the trust specifically stated that the "Trustee shall have complete discretion to pay or use . . . the net income and/or corpus of the Trust as the Trustee, in its sole discretion, may determine to be reasonably necessary for [the beneficiary]." *Id.* We accordingly concluded that it was within the trustee's discretion to determine when and what amounts were distributed to the beneficiary. *Id.*

Paragraphs I–IV, VIII, XI, and XII of the trust instrument demonstrate that the trust was created first to benefit the surviving spouse (becoming irrevocable upon the death of either J.C. or Oneda); then to benefit the four children—John, Edith,

39

Lawrence, and Kelly; and thereafter to benefit the four children's "issue and descend[a]nts," even explaining how payments could be made to minors and that at the termination of the trust 21 years after the death of the last measuring life, the trust corpus and income would be distributed to each primary beneficiary's "issue and/or descend[a]nts" per stirpes. The remaining paragraphs make clear that the trustee was vested with absolute discretion upon the trust's becoming irrevocable to protect the interests of the surviving spouse, the four children, and the four children's issue and descendants.

Paragraph V states that after one of the grantors dies, the trustee could pay net income to the trust and sub-trust beneficiaries, with one exception, "in such amounts and proportions as [the] Trustee in its *sole and absolute discretion* shall deem advisable, from time to time, without regard to equality of distribution." [Emphasis added.] The exception was that an equal amount was to be taken from each of the four sub-trusts for any and all distributions made to the surviving spouse, with any income not so disbursed to be incorporated into the sub-trusts' corpus, to continue to be held, administered, and distributed under the trust's terms.

Paragraph VII likewise provides for the trustee, "in its *sole and absolute discretion,*" to make disbursements from the trust corpus for emergency or extraordinary expenses arising for the four children, their spouses, and their children, and it reiterates that "the Trustee's discretion shall be conclusive as to the advisability of any such disbursement and the same shall not be subject to review." [Emphasis added.]

Paragraph XIV(7) allows the trustee the final decision with regard to whether to treat "all receipts or other property received" by the trusts as either corpus or income, and (16) allows the trustee "[t]o deal in any manner as between the trusts" as it thought advisable. And Paragraph XXIII gives the trustee the authority to resolve doubts about the trust's construction "in such manner as [it] shall deem equitable and proper" and provides that such decisions and actions would be final and binding "in the absence of bad faith."

Paragraph IX provides that once the trust became irrevocable but a surviving spouse remained alive, then after distributions were made to the surviving spouse and payments made for the deceased grantor's funeral expenses, cemetery lot, gravestone, and death taxes (and funds set aside for the surviving spouse—from all four trusts— and for the beneficiaries from their individual trusts, for funeral expenses, cemetery lots, gravestones, and death taxes), then the balance of net income in the JCC and EAB trusts could—but did not have to—be disbursed "as the Trustee may deem advisable," i.e., with due consideration not only for John and Edith but also for "their issue and descend[a]nts."[28]

---

[28]As pointed out by Wells Fargo, even though Tina sought funds from 1992– 1993, because Oneda did not die until 1993—24 years after the trust instrument was executed—even without absolute discretion to withhold distributions, the trustee could not have made a mandatory distribution of all income to John or his descendants before 1993.

In the context of the trustee's discretion for classifying income and corpus set out elsewhere in the trust agreement, and other terms set out in the trust agreement—specifically Paragraphs III and XI—showing that the grantors knew how to use mandatory language if they wanted to compel the distribution of all net income, Paragraph IX appears to demonstrate nothing more than the grantors' desire to show the two children from J.C.'s first wife that they would enjoy income from their inheritance sooner rather than later, albeit subject to the trustee's discretion, distributions for their stepmother until her death, and the cost of various funeral and associated expenses of their father's death and future funeral and associated expenses of their stepmother's death.[29]

In short, the trustee was allowed to determine when and how much net income would be paid to each sub-trust beneficiary and was allowed to treat trust income as part of the trust corpus to provide not only for the grantors' children but also for the grantors' grandchildren until the trust's expiration. Within the context of the trust's four corners, then, Paragraph IX is unambiguous and its "desire" language is precatory rather than mandatory.

---

[29]Because we conclude that the trust is not ambiguous, we do not reach extrinsic evidence to determine the grantors' intent. *See Hysaw v. Dawkins*, 483 S.W.3d 1, 8, 13 (Tex. 2016) (addressing when extrinsic evidence may be considered and reaffirming "our commitment to a holistic approach aimed at ascertaining intent from all words and all parts of the conveying instrument").

Accordingly, we conclude that the trial court erred by granting summary judgment for Tina as to its construction of Paragraph IX because, in light of the remaining language in the trust agreement, the trust agreement did not require an immediate or mandatory distribution of all of the JCC Trust's net income to John or his descendants. We sustain Wells Fargo's first issue.

Because we sustain Wells Fargo's first issue, we need not address the merits of its remaining issues.[30] *See* Tex. R. App. P. 47.1. That is, because the trial court erred as a matter of law in its interpretation of the trust language, its order granting summary judgment for Tina and awarding damages and prejudgment interest to her and awarding attorney's fees to Tina and the LC Trust Beneficiaries was likewise erroneous, and the trial court's erroneous interpretation led in part to its denial of Wells Fargo's claim for attorney's fees, which must also be reconsidered on remand. *See Kachina Pipeline Co., v. Lillis*, 471 S.W.3d 445, 455 (Tex. 2015) (op. on reh'g) (stating that when an appellate court reverses a declaratory judgment, it may reverse an attorney's fee award and remand to determine the appropriate award of costs and fees); *City of Mansfield v. Savering*, No. 02-19-00174-CV, 2020 WL 4006674, at *13 (Tex. App.—Fort Worth July 16, 2020, pet. denied) (mem. op.) (same).

---

[30]Wells Fargo points out in its brief that the interpretation of the trust instrument is dispositive of the entire appeal if the trial court erroneously construed the instrument in Tina's favor.

## IV. Conclusion

Having sustained Wells Fargo's first issue, we reverse the trial court's judgment and remand the case to the trial court for further proceedings in light of our construction of the trust above.

/s/ Bonnie Sudderth
Bonnie Sudderth
Chief Justice

Delivered: September 16, 2021